## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

ELIZABETH A. METTILLE,

       *Plaintiff*,

v.

                                      Case No. 22-CV-4019-EFM-RES

PRAIRIE EXPRESS, INC.,

       *Defendant*.

## MEMORANDUM AND ORDER

Following this Court's entry of default judgment in favor of Plaintiff, an evidentiary hearing on Plaintiff's damages was held on March 20, 2025. Plaintiff seeks several types of damages in her Complaint and in her Motion for Default Judgment, including back pay, compensatory and punitive damages, and attorneys' fees and costs. *See* Doc. 1, 8. The types of damages available on default judgment are limited to those in the Complaint. Fed. R. Civ. P. 54(c). "Plaintiff must establish that the amount requested is reasonable under the circumstances." *Olivas v. Bentwood Place Apartments, LLC*, 2010 WL 2952393, at *4 (D. Kan. July 26, 2010).

### A.      Back Pay

Plaintiff seeks back pay in her motion for default judgment. Doc. 57 at 15–18; *see also Olivas*, 2010 WL 2952393, at *8 (stating that Title VII allows back pay). The purpose of back pay is to make a plaintiff whole. *Bennett v. Luigi's Italian Rest.*, 2020 WL 1503472, at *4 (D. Kan. Mar. 30, 2020). "In ruling on a motion for default judgment, the court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for default judgment."

*Olivas*, 2010 WL 2952393, at *7. Plaintiff has submitted an affidavit regarding back pay. *See* Doc. 57 at 24–27. She also testified to her lost back pay at the hearing. The following is a breakdown of Plaintiff's lost wages based on Plaintiff's affidavit and Plaintiff's testimony at the evidentiary hearing.

Plaintiff was constructively discharged from her job with Defendant on March 28, 2021. While working for Defendant, Plaintiff earned approximately $870.00 per week ($145 per day x 6 days per week). *See* Doc. 57 at 25, ¶ 6. Plaintiff quickly obtained new employment with Kansas Housing Resources Corporation on March 29, 2021, but earning less than she did working for Defendant, making $800.00 per week ($160 per day x 5 days per week). *Id.* at ¶ 9. The position with Kansas Housing Resources Corporation was temporary in nature and ended on May 31, 2021. *Id.* For approximately 9 weeks between March 29, 2021 and May 31, 2021, Plaintiff earned $70.00 less per week working for Kansas Housing Resources Corporation than she did working for Defendant, equaling $630.00 in lost wages between March 29, 2021 and May 31, 2021. *Id.*

Plaintiff was unemployed and searching for new employment between June 1, 2021 and August 7, 2021. *Id.* Had Plaintiff still been working for the Defendant between June 1, 2021 and August 7, 2021, Plaintiff would have earned $145 per day for 59 days (6 days per week x 9 weeks + 5 extra days), equaling $8,555 in lost wages during that time period. *Id.*

Because the individual responsible for harassing Plaintiff while she was employed with Defendant was no longer employed there as of August 2021, Plaintiff returned to employment with Defendant starting August 8, 2021. She was reinstated as a delivery driver at the same payrate she had received the first time she worked for Defendant. "Back pay liability normally runs until the employer makes a valid, unconditional reinstatement offer." *Aguinaga v. United Food & Com. Workers Int'l Union*, 854 F. Supp. 757, 770 (D. Kan. 1994), *aff'd as modified*, 58 F.3d 513 (10th

Cir. 1995). "A back pay claimant who rejects a valid reinstatement offer is therefore not entitled to back pay for the period after the rejection of the offer." *Id.* Thus, it follows that a back pay claimant who accepts a valid reinstatement offer is not entitled to back pay for the period after the acceptance of the offer. *See id.* "The purpose of a back pay award is to make the employee whole—i.e., restore the economic status quo that would have obtained but for the wrongdoing on the part of the employer." *Aguinaga v. United Food & Com. Workers Int'l Union*, 993 F.2d 1463, 1473 (10th Cir. 1993). When the employer offers reinstatement, and the employee accepts, the employee has been put back in the position she was in before termination. This does not mean that she loses entitlement to back pay during the interim, but it does sever her ability to receive back pay after acceptance. *See Comacho v. Colo. Elec. Tech. Coll., Inc.*, 590 F.2d 887, 889 (10th Cir. 1979) ("[A] reinstatement offer without back pay does not relieve a guilty employer from further liability."). Allowing her to continue to receive back pay after this period would result in a great windfall to the Plaintiff—something routinely rejected by precedent. *See, e.g.*, *Goico v. Boeing Co.*, 347 F. Supp. 2d 986, 992 (D. Kan. 2004) ("[T]he district court must attempt to make the plaintiff whole, yet the court must avoid granting the plaintiff a windfall."). As such, Plaintiff is entitled to back pay for her lost wages in between the times she worked for Defendant, but not after her reinstatement.

Considering Plaintiff's mitigating wages, Plaintiff has lost $9,185.00 ($630 + $8,555) in wages that she would have otherwise earned had she not been constructively discharged by Defendant. In light of the evidence in the record, the Court finds a back pay award of $9,185.00 is appropriate.

**B.    Compensatory & Punitive Damages**

Plaintiff also seeks compensatory and punitive damages. *See* Doc. 1, 8. Under 42 U.S.C. § 1981a(b)(2)–(3), a plaintiff may seek compensatory damages for "future pecuniary losses,

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." Compensatory damages must be established by a preponderance of the evidence. *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1318 (10th Cir. 2022) (affirming the district court's application of the preponderance of the evidence standard). Plaintiff also seeks punitive damages, which may be awarded after establishing Defendant's malicious or reckless indifference to Plaintiff's federally protected rights. *Wirtz v. Kan. Farm Bureau Servs., Inc.*, 311 F. Supp. 2d 1197, 1219 (D. Kan. 2004). In this case, where Defendant had more than 14 but fewer than 101 employees, the sum of compensatory and punitive damages are limited to $50,000. 42 U.S.C. § 1981a(b)(3)(A). Plaintiff seeks the full $50,000.

Under the preponderance of the evidence standard, Plaintiff need only show that it is more likely than not that she suffered harm due to Defendant's conduct. Plaintiff has met this burden. Plaintiff testified that Vern would make sexual comments to her, would corner her in her truck, and would physically touch her, including at least one instance of him pulling her hair. Plaintiff complained about Vern's harassment to Defendant's owner and her supervisory staff and was "assured that action would be taken," that "they would 'look into' it," and "take care of" Plaintiff's complaints, but Defendant took no such action. *See* Doc. 57 at 26, ¶ 13. Instead of intervening, Defendant permitted Vern's misconduct to escalate. Plaintiff testified that Vern tampered with her delivery truck by loosening the bolts on the truck's wheels and loosening the straps used to secure packages within the truck, placing Plaintiff's physical safety at risk. *See id.* at ¶¶ 14–15.

Plaintiff further testified regarding the emotional and personal consequences of Defendant's inaction. She stated she feared for her safety every time she was in her delivery truck or alone at the work site, and that this distress contributed to the breakdown of her marriage, ultimately leading to her divorce and placing strain on her family relationships. *See id.* at ¶¶ 16–

17. These facts establish by a preponderance of the evidence that Plaintiff suffered compensable harm—emotional distress, fear for her safety, and damage to her familial relationships—as a direct result of Defendant's failure to act.

To be entitled to punitive damages, Plaintiff must satisfy a higher burden than that required for compensatory damages. But Plaintiff has met this heightened standard. Plaintiff testified that after she reported Vern's harassment to Defendant's owner, he began acting differently toward her and stated that she should dismiss her complaint before the Kansas Human Rights Commission. *See* Doc. 57 at 26, ¶¶ 16–17. This statement demonstrates retaliatory intent and a disregard for Plaintiff's right to pursue relief through protected legal channels. Rather than investigate or remedy the situation, Defendant pressured Plaintiff to recant. Moreover, Defendant took no action even after being informed that Vern had endangered Plaintiff's physical safety by tampering with her truck—an act that could have led to serious injury or death. *See id.* at ¶¶ 14–15. Defendant's willful inaction in response to this serious misconduct constitutes reckless indifference to Plaintiff's federally protected rights. Taken together, Defendant's failure to act, its tolerance of escalating harassment, and the retaliatory conduct of its owner meet the standard for punitive damages. As such, Plaintiff has shown that Defendant did not merely fail to protect her—but also acted with a conscious disregard for her safety and legal rights.

In determining a proper award amount in this case, the Court has considered awards in other cases, particularly those in which default judgment was entered. In *Bennett v. Luigi's Italian Restaurant*, one plaintiff claimed "offensive sexual comments and unwelcome physical contact," and a defendant who "'brought up sex constantly,' made sexual jokes about the food at the restaurant, would brush up against [the plaintiff] and touch her at work, requested to have sex with

her, and implied that if she did not comply she would not have her position much longer." 2020 WL 1503472, at *2.

The other plaintiff reported "repeated sexual comments, questions about her personal sex life, calls at home, direct requests for her to have sex with [the defendant], and that eventually [the defendant] exposed his genitals to her at the restaurant." *Id*. The court awarded compensatory damages of $5,000 each in awarding default judgment. *Id*. at *7. An additional $5,000 each was awarded in punitive damages. *Id*. at *7–8 (finding that the restaurant owner "show[ed] a casual indifference to the gravamen of plaintiffs' claims" in comments made at the default judgment hearing).

In *Townley v. Servicemaster Co.,* coworkers told the plaintiff she was hired "only for affirmative action, that she worked in a man's world, and that she was successful during walk-in visits with customers because she had certain assets that men don't have." 2017 WL 4843296, at *3 (D. Kan. Oct. 25, 2017). One coworker said, "Look, dessert just walked in," when the plaintiff came in the break room and then said to others in the room, "Do you want to use a spoon or a fork?" *Id*. The plaintiff complained 20–30 times, made three written complaints, and two hotline complaints, all of which were ignored. *Id*. The plaintiff was eventually fired for allegedly pretextual reasons. *Id*. The court awarded $50,000 in compensatory damages on default judgment, in part from the stress of losing her full-time job. *Id*. at *6. The court awarded $100,000 in punitive damages in part due to the defendant ignoring the plaintiff's many complaints. *Id*. at *8.

The plaintiffs in both *Bennett* and *Townley* share similar harms to Plaintiff in this case. However, the Court finds the award amounts in *Bennett* more persuasive because, like in this case, the employer had more than 14 but fewer than 101 employees. In *Townley*, the employer had over 500 employees, which substantially raised the statutory damages cap and influenced the court's

decision to award substantially more punitive damages. However, the Court finds that Plaintiff suffered more severe damages than were present in *Bennett* and awards Plaintiff $15,000 to compensate her for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. In addition, the Court awards Plaintiff $10,000 in punitive damages to punish Defendant's inappropriate conduct. Accordingly, the Court finds a combined compensatory and punitive damages award of $25,000 appropriate.

## C.    Attorneys' Fees & Costs

Plaintiff also seeks attorneys' fees and costs. Prevailing parties may be entitled to attorneys' fees under Title VII. *Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1176 (10th Cir. 2010). The party claiming fees must prove she was the prevailing party and that the fee request is reasonable. *Id.* Given that the Court has found Plaintiff is entitled to default judgment on her substantive claims, she is the prevailing party. *See Townley v. Servicemaster Co., LLC*, 2017 WL 5517948, at *2 (D. Kan. Nov. 17, 2017) ("*Townley II*").

The Court therefore turns to whether the fee request is reasonable. The amount of fees to be awarded is within the Court's discretion. *Bennett*, 2020 WL 1503472, at *10. The burden is on the party seeking the attorneys' fees. *See Townley II*, 2017 WL 5517948, at *2. The starting point for determining whether a fee request is reasonable is the number of hours multiplied by a reasonable hourly rate, known as the lodestar. *Flitton*, 614 F.3d at 1176. "In setting the hourly rate, the court should establish, from the information provided to it and from its own analysis of the level of performance and skill of each lawyer whose work is to be compensated, a billing rate for each lawyer based upon the norm for comparable private firm lawyers in the area in which the court sits, calculated as of the time the court awards fees." *Fox v. Pittsburg State Univ.*, 258 F. Supp. 3d 1243, 1263–64 (D. Kan. 2017) (internal quotation and citation omitted). If the moving

party establishes that the hours spent and rate applied are reasonable, the lodestar amount is presumed to be reasonable. *Townley II*, 2017 WL 5517948, at *2.

Once the lodestar is determined, the Court may adjust the figure upward or downward using several factors. *Id*.

> Those factors are: (1) time and labor required; (2) novelty and difficulty of the questions presented in the case; (3) skill requisite to perform the legal service properly; (4) preclusion of other employment by the attorneys due to acceptance of the case; (5) customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or circumstances; (8) amount involved and results obtained; (9) experience, reputation, and ability of the attorneys; (10) undesirability of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id*.

The Court may incorporate these factors in calculating the lodestar. *See id*.

### 1.    *Reasonable Hourly Rate*

Plaintiff's counsel claims an hourly rate of $250 per hour. This rate is based on a few factors. First, it is a combined rate reflecting the work of Plaintiff's counsel and a more senior attorney at her law firm who reviews her work. Plaintiff's counsel, who has been practicing since 2020, typically bills between $200 to $250 per hour, while the more senior attorney who has been practicing since 1993 typically bills at a rate of $250 to $350 per hour. *See* Doc. 65 at 3. Second, it is based on a determination in 2004 that $150 per hour was a reasonable rate for Topeka, Kansas, adjusted by an average rate of inflation of 2.6% over the last 20 years. *Id.*; *see also Leidel v. Ameripride Servs., Inc*., 322 F. Supp. 2d 1206, 1211 (D. Kan. 2004).

The Court finds that $250 per hour is a reasonable hourly rate in this case. Plaintiff has offered evidence to support this hourly rate. And it is consistent with the hourly rates charged in this market based on the Court's own knowledge and experience. *See Kan. Penn Gaming, LLC v. HV Props. of Kan., LLC*, 790 F. Supp. 2d 1307, 1319–20 (D. Kan. 2011) ("Having carefully considered the evidence before the court and the court's own familiarity with the relevant rates in

this community, this court shall allow the following hourly rates: $325 per hour for the partners; $200 for the associates; $125 for the law clerks; and $100 for the paralegals and other support staff. The court believes that these figures represent the top end of the hourly rates in Topeka."); *Bennett*, 2020 WL 1503472, at *10 ("Based upon its review of counsel's Declaration along with its own personal knowledge of rates customarily charged in the community, the court concludes that a rate of $350 per hour for counsel's services, while on the high end, is not unreasonable.")

### 2.    *Reasonable Number of Hours*

Plaintiff's counsel submitted evidentiary support showing 91.5 hours spent working on this case. *Id*. This number of hours is reasonable in light of the lengthy record. The hours worked by Plaintiff's counsel multiplied by the hourly rate yields a lodestar amount of $22,875.00. The Court has considered this amount in light of the factors listed above and finds no grounds to adjust the lodestar upward or downward. Although the legal issues in this case are not particularly novel or complex, Defendant's default and business status have required additional work and investigation, including several attempts to contact Defendant to provide notice of the status of the case. The Court therefore awards the lodestar amount of $22,875.00.

### 3.    *Costs*

Plaintiff seeks $566.42 in costs. Based on the evidence in the record, *see* Doc. 65 at 15, the Court finds an award of costs in this amount is appropriate.

### D.    **Conclusion**

The Court finds sufficient evidence and a legal basis to grant Plaintiff default judgment on her claims and awards Plaintiff damages in the amount of $57,626.42 which is comprised of: $9,185.00 in back pay; $15,000.00 in compensatory damages; $10,000.00 in punitive damages; $22,875.00 in attorneys' fees; and $566.42 in costs.

**IT IS THEREFORE ORDERED** that judgment be entered in favor of Plaintiff and against Defendant in the amount of $57,626.42.

**IT IS SO ORDERED.**

This case is closed.

Dated this 18th day of April, 2025.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE